UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

ANNE MARIE CRONIN

                      Plaintiff,

         -against-

THE CITY OF NEW YORK,
THE NEW YORK CITY DEPARTMENT OF
CORRECTION, CAPTAIN MORRIS LEWIS
(Individually And In His Respective Capacity As
An Acting Officer of the New York City Department
of Correction), ASSISTANT DEPUTY WARDEN
ANTOINETTE PINCKNEY (Individually And In Her
Respective Capacity As An Acting Officer of
the New York City Department of Correction),
CAPTAIN TANIA FIGUEROA (Individually And In
Her Respective Capacity As An Acting Officer of the.
New York City Department of Correction),
CAPTAIN NEESHA JASMINE (Individually And In
Her Respective Capacity As An Acting Officer of the
New York City Department of Correction), and
CAPTAIN LATISHA HAMILTON (Individually And
In Her Respective Capacity As An Acting Officer of
The New York City Department of Correction)

                      Defendants.

----------------------------------------------------------------X

**Civil Action No.:**

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

      Plaintiff, ANNE MARIE CRONIN ("hereinafter "Plaintiff" or "Plaintiff CRONIN")

by and through her attorneys, L & D LAW P.C (*Liggieri & Dunisha*), complaining of

Defendants, jointly and severally, herein respectfully shows to this Court and alleges the

following:

## NATURE OF THE CASE

1.  This is an action to remedy discrimination based on gender discrimination, race

    discrimination, sexual harassment, hostile work environment, retaliation along with the

    deprivation of constitutional rights. This action is brought by Plaintiff Anne Cronin

1

pursuant to the provisions of the United States Code, 42 U.S.C. §1983 §1985, §1986 and pursuant to Article I, §11 of the New York State Constitution for the violation of her due process and other constitutional rights to be free from gender discrimination, race discrimination, sexual harassment, hostile work environment and retaliation.

2.  Plaintiff Anne Cronin also complains pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e et. Seq. ("Title VII"), and to remedy violations of the laws of the State of New York, and City of New York, based upon diversity and the supplemental jurisdiction of this Court pursuant to Gibb, 38 U.S. 715 (1966) and 28 U.S.C. §1367, seeking relief and damages to redress the injuries Plaintiff has suffered as a result of being sexually harassed, discriminated, and retaliated against by her employer on the basis of gender discrimination, racial discrimination, sexual harassment, hostile work environment and retaliation inflicted upon Plaintiff by Defendants.

3.  Defendants engaged in a pattern and practice of committing unlawful and unconstitutional conduct and had prior knowledge of such acts

## JURISDICTION AND VENUE

4.  Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3), and 28 U.S.C. §1331 and the Civil Rights Act of 1866 and 1871, which give this Court jurisdiction for each statute; the damages, exclusive of interest and costs in this instance exceed that of all lower courts, and this Court's pendent jurisdiction if also invoked.

5.  The unlawful employment practices alleged herein occurred wholly or in part, in the jurisdiction of the Eastern District of New York.

## JURY DEMAND

6.  Plaintiff hereby demands a trial by jury on all issues properly triable thereby.

**PARTIES**

7.   Plaintiff Anne Cronin is a Caucasian woman and is a resident of the State of New York in the County of Queens.

8.   Plaintiff was hired by the City of New York and its agency, the New York City Department of Correction (hereinafter "DOC"), in or around May 2013, as a full-time employee in the position of Correction Officer.

9.   Defendant, The City of New York, is a municipal corporation, incorporated in the City of New York, acting as a corporation and as a public trust.

10.  Defendant, The City of New York DOC is a subsidiary municipal corporation under the City of New York, incorporated in the State of New York.

11.  The causes of action in this case arise in New York City within the County of Queens, County of New York.

12.  The City of New York DOC assumes the risk of its Wardens, Captains and officers who act under the color of law as uniformed officers and/or employees of the City of New York and its subsidiary agency, the DOC.

13.  The DOC has their headquarters at 75-20 Astoria Blvd, East Elmhurst, NY 11370.

14.  At all relevant times, the City of New York acted through its agency, the DOC, to commit the acts alleged in this Complaint and were responsible for such acts.

15.  At all times material, Defendant DOC operates under the purview of the City of New York and exists by the virtue and laws of the State and City of New York. The DOC manages eleven inmate facilities in the City of New York throughout all five boroughs.

16.  At all times material, Defendant, Captain Morris Lewis (hereinafter referred to as "Defendant

Lewis" or "Lewis") was and is a supervising employee with the DOC.

17. At all times material, Defendant Lewis had direct supervisory authority over Plaintiff with regard to her employment which included but was not limited to the ability to hire and fire along with other tangible employment actions.

18. At all times material, Defendant Lewis discriminated against Plaintiff on the basis of her gender and race and subjected the Plaintiff to sexual harassment and retaliation by consistently discriminating against Plaintiff with denigrating comments and unwanted sexual advances in front of other officers and inmates.

19. Additionally, Defendant Lewis subjected Plaintiff to disparate treatment because of her gender and race.

20. At all times material, Defendant, Assistant Deputy Warden ("ADW") Pinckney (hereinafter referred to as "Defendant Pinckney"), was and is a supervising employee with the DOC.

21. At all times material, Defendant Pinckney had direct supervisory authority over Plaintiff with regard to her employment which included but was not limited to the ability to hire and fire along with other tangible employment actions.

22. At all times material, Defendant Pinckney discriminated against Plaintiff on the basis of her gender and race and retaliated against Plaintiff for filing sexual harassment complaints against Defendant Lewis and for complaining about other unlawful acts.

23. Additionally, Defendant Pinckney subjected Plaintiff to disparate treatment because of her complaints of sexual harassment against Defendant Lewis.

24. At all times material, Defendant, Captain Tania Figueroa (hereinafter referred to as "Defendant Figueroa"), was and is a supervising employee with the DOC.

25. At all times material, Defendant Figueroa had direct supervisory authority over Plaintiff with regard to her employment which included but was not limited to the ability to hire and fire along with other tangible employment actions.

26. At all times material, Defendant Figueroa discriminated against Plaintiff on the basis of her gender and race and retaliated against Plaintiff for filing sexual harassment complaints against Defendant Lewis.

27. Additionally, Defendant Figueroa subjected Plaintiff to disparate treatment because of her complaints of sexual harassment against Defendant Lewis.

28. At all times material, Defendant, Captain Neesha Jasmine (hereinafter referred to as "Defendant Jasmine"), was and is a supervising employee with the DOC.

29. At all times material, Defendant Jasmine had direct supervisory authority over Plaintiff with regard to her employment which included but was not limited to the ability to hire and fire along with other tangible employment actions.

30. At all times material, Defendant Jasmine discriminated against Plaintiff on the basis of her gender and race and retaliated against Plaintiff for filing sexual harassment complaints against Defendant Lewis.

31. Additionally, Defendant Jasmine subjected Plaintiff to disparate treatment because of her complaints of sexual harassment against Defendant Lewis.

32. At all times material, Defendant, Captain Latisha Hamilton (hereinafter referred to as "Hamilton"), was and is a supervising employee with the DOC.

33. Upon information and belief, Captain Hamilton is also known by her maiden name; Harrell.

34. At all times material, Defendant Hamilton had direct supervisory authority over Plaintiff with regard to her employment which included but was not limited to the ability to hire and fire along with other tangible employment actions.

35. At all times material, Defendant Hamilton discriminated and retaliated against Plaintiff on the basis of her race and gender and retaliated against Plaintiff for filing sexual harassment complaints against Defendant Lewis.

36. Additionally, Defendant Hamilton subjected Plaintiff to disparate treatment because of her complaints of sexual harassment against Defendant Lewis.

37. At all times material, City Defendants and their supervisors are policymakers.

38. At all times material, City Defendants and the DOC have displayed a historical pattern and practice of failing to properly train employees, despite knowing to a moral certainty that their employees consistently face dangerous situations of sexual harassment and assault from inmates as evidenced below.

39. At all times material, the City Defendants' training programs for their DOC employees is deficient and is also directly related to the injuries cited below.

40. At all times material, the DOC Equal Employment Office ("EEO") was and is tasked with investigating complaints of discrimination.

41. Upon information and belief, the EEO has a historical pattern of mishandling and failing to properly investigate protected complaints.

## **PROCEDURAL HISTORY**

42. On or about April 7, 2021, Plaintiff filed an internal DOC EEO complaint, naming Captain Morris Lewis as the Respondent. This complained alleged discrimination based on sexual harassment and retaliatory animus.

6

43. On or about June 21, 2021, Plaintiff filed another DOC EEO complaint, naming Captain Morris Lewis as the Respondent. The foregoing complaints alleged discrimination based on sexual harassment, retaliation and hostile work environment.

44. On or about July 14, 2021, the EEO responded stating that Plaintiff's allegations revealed sufficient evidence to support Plaintiff's allegation of sexual harassment.

45. On or about July 19, 2022, Plaintiff filed a charge of gender discrimination, race discrimination, sexual harassment, retaliation and hostile work environment with the Federal Equal Employment Opportunity Commission ("EEOC").

46. On or about November 30, 2022, the EEOC issued a Right to Sue letter allowing the Plaintiff to file a lawsuit against the Respondent(s) in federal court.

47. This lawsuit is being filed within receipt of the 90-day EEOC Right to Sue provision.

## **FACTS**

48. On or about May 16, 2013, the Plaintiff began her career with the Department of Correction.

49. Plaintiff has maintained an exemplary record since she started with the Department of Correction.

50. On or about October 17, 2016, was a turning point for the Plaintiff when she was sexually assaulted by an inmate.

51. In the days that followed, Plaintiff was further humiliated by the Defendants' handling of the incident.  Specifically, Becky Scott, the warden of Eric M. Taylor Center ("EMTC") began conducting roll calls with all of the officers and would often berate and humiliate the Plaintiff during these roll calls.

52. Specifically, Warden Scott humiliated the Plaintiff and showed the video of the Plaintiff being sexually assaulted to everyone that attended roll call; without Plaintiff's knowledge or consent.

53. In the weeks that followed, word of Plaintiff's assault and how the DOC handled the matter, spread throughout the facility. It was openly discussed amongst officers and inmates, which was extremely embarrassing to the Plaintiff.

54. In fact, the inmate who assaulted the Plaintiff was bragging about only getting a few extra days of "bad time" (referring to additional time needed to be served) and telling DOC officers that it was ***"totally worth it"***.

55. On or about December 22, 2016, the Plaintiff was sexually assaulted by another inmate who told the Plaintiff that he was aware of her first assault and knew he would not face hard repercussions.

56. DOC mismanagement of Plaintiff's first complaint and sexual assault incident caused Plaintiff to lose her trust in in the DOC's ability to properly defend her in dangerous situations.

57. Despite what occurred, the Plaintiff continued to work hard and eventually, in or around 2018, Plaintiff took the captain's test and passed. Plaintiff is currently on the waiting list to become a captain.

58. The sexual attacks and DOC mismanagement did not stop because in or around 2019, Defendant Captain Lewis started sexually harassing the Plaintiff.

59. On or about May 11, 2019, as the Plaintiff was picking up inmates to work in the Mess Hall, Defendant Lewis requested to speak with the Plaintiff in the housing area, at which time he placed his hand inside the crotch area between Plaintiff's belt and pants. Lewis

then dragged Plaintiff by the belt directly by the crotch area, to the table where Defendant

Lewis was sitting, in order to reprimand and humiliate the Plaintiff publicly.

60. The sudden pull exerted by Defendant Lewis forced Plaintiff's crotch area uncomfortably

close to Defendant Lewis' face.

61. Defendant Lewis inappropriately and forcibly put his hands inside Plaintiff's belt without

Plaintiff's permission and against Plaintiff's will.

62. Upon information and belief Defendant Lewis never touched any male officer in such a

predatory and unlawful manner.

63. Defendant DOC's Captain Defendant Lewis sexually harassed and discriminated against

the Plaintiff on the basis of her sex/gender, leaving the Plaintiff in a state of shock and

disbelief.

64. On or about May 11, 2019, as a result of the above, the Plaintiff time stamped a

Department of Correction- Intradepartmental Memorandum against Defendant Lewis

stating in part:

> Captain Lewis was in the housing area and requested
> to speak with me, I approached Captain Lewis who was
> seated at the officers table at which time he put his hand
> inside the front of my belt and dragged me closer to him
> reprimanding me over how the workers were being searched
> in intake….
> It is extremely embarrassing that I am constantly
> being berated in front of inmates and officers on practices
> that are out of my control, being a female officer and not
> having any control over intake search procedures.

65. On or about May 23, 2019, Defendant Lewis approached to Plaintiff and reprimanded her

for her not properly searching the inmates and for failing to properly check inmate

wristbands, which was patently false.

66. The Plaintiff escorted the Mess Hall workers to intake at which time Captain Lewis proceeded to harass Plaintiff a second time over the same issues; despite the fact that certain search protocols and wristband protocols for inmates were not the Plaintiff's responsibility as a mess hall officer. These issues were used only as excuses for Defendant Lewis to harass the Plaintiff.

67. During the same day and a few hours later, Defendant Lewis approached Plaintiff again; only this time he placed his hands upon Plaintiff's shoulders, began groping Plaintiff's shoulders and asking the Plaintiff whether he was being "too hard" on her.

68. Plaintiff spoke up and told Defendant Lewis that she indeed found him to be too hard on her and that his actions made her feel uncomfortable.

69. Defendant Lewis continued to grope Plaintiff's shoulder and told her that it was because he saw greatness in her and felt he could *"inspire"* her for greater things.

70. The unwanted sexual advance(s) by Defendant Lewis instantly made Plaintiff uncomfortable.

71. The above actions demonstrate how  Defendant Lewis subjected Plaintiff to *quid pro quo* sexual harassment by trying to use his position in exchange for sexual favors.

72. Immediately groping Plaintiff, Defendant Lewis called the Plaintiff over again, asking the Plaintiff what she had on her wrist. Plaintiff informed him that it was a FitBit.

73. In response, Defendant Lewis then leveled another sexually charged remark at the Plaintiff and told her she didn't need a Fitbit because she was already in good shape and to not fix what is not broken.

74. On or about May 23, 2019, Plaintiff time stamped and memorialized another Department of Correction- Intradepartmental memorandum against Defendant Lewis stating in part:

At approximately 13:00 hours I was approached by Captain Lewis as I escorted the Mess hall line workers to intake. He proceeded to harass me in front of the inmates and officers over the workers not being properly searched and then over the condition of some of the workers wristbands, issues that are not part of my responsibility as a mess hall officer. At approximately 14:10 hours outside of the A station in Intake,

Captain Lewis unwantedly placed his hand on my shoulder asking me if I thought he was being too hard on me. He then proceeded to tell me that he saw greatness in me and felt he could inspire me….After the encounter he then called me over once again asking me what was on my wrist. I informed him that it was a FitBit and not an Apple watch. He then stated that I did not need a FitBit that I was already in shape and *"Don't fix what's not broken."*

Captain Lewis's behavior is not only embarrassing and humiliating but the constant ridicule is making it hard for me to perform my job. He is constantly trying to find any excuses to criticize my work ethic and berating me in front of officers and inmates.

75. In the days and weeks that followed, Defendant Lewis continued his predatory and unlawful behavior.

76. Defendant Lewis would often approach Plaintiff on duty and inappropriately touch her in front of inmates, to such an extent that even inmates noticed the inappropriate touching. In some cases, inmates even asked the Plaintiff *"Why are you letting him touch you?"*

77. Upon information and belief, according to the rules and regulations set forth by the Defendants, Defendants, at least ostensibly, prohibited such behavior.

78. Defendant Lewis' inappropriate and unlawful behavior put the Plaintiff at risk, especially since the Plaintiff already had a history of being sexually harassed by the inmates.

79. Upon information and believe, the DOC failed to adequately train employees in sexual harassment and discrimination, such that Plaintiff and others similarly situated can work in a discrimination-free and sexual-harassment-free environment.

80. Despite prior situations involving Defendant Lewis, the DOC failed to intervene and prevent Plaintiff from being sexually harassed by Captain Lewis and other inmates.

81. In the following months, Plaintiff refrained from engaging with Defendant Lewis as much as possible, avoiding his advances and minimizing interaction as best as she could.

82. On or about December 31, 2019, at approximately 8:14 P.M., while the Plaintiff was inside the female locker room, Plaintiff's colleagues informed the Plaintiff that Defendant Lewis was waiting for her outside of the women's locker room.

83. Considering her previous interactions with Defendant Lewis which included but was not limited to the inappropriate comments, the touching, the manhandling; Plaintiff found it unsettling to go out of the women's locker room and talk to Defendant Lewis.

84. Plaintiff felt helpless because Defendant Lewis' sexual advances were never ending. The Plaintiff did not want to meet Defendant Lewis and feared retaliation for denying his unwanted sexual advances. Thus, Plaintiff decided not to come out of the women's locker room.

85. In order not to antagonize Defendant Lewis, the Plaintiff sat helplessly in the locker room for over twenty (20) minutes. Plaintiff asked her colleague if Defendant Lewis was still waiting outside the locker room. Once Plaintiff's colleague told her that Defendant Lewis left, Plaintiff was able to come out of the locker room.

86. On or about January 5, 2020, while on duty, Defendant Lewis approached the Plaintiff demanding to know why she had left him waiting outside the women's locker room.

87. Plaintiff told Defendant Lewis that she did not know what he was talking about and tried to get away from him as fast as possible. However, Defendant Lewis forced Plaintiff to

justify herself on why she had refused to meet with him by the women's locker room. Plaintiff responded  that she had no idea what he was talking about.

88. Plaintiff felt as if she was walking on thin ice because Defendant Lewis was her superior. However, Plaintiff also felt the need to protect herself from his continuous sexual harassment and gender discrimination.

89. In or around February 2020, EMTC closed, and Plaintiff was transferred to the Rose M. Singer Center. Plaintiff was glad to be transferred because she thought the unprovoked sexual harassment, gender discrimination, and retaliation from Defendant Lewis would end.

90. On or about August 2, 2020, the Special Search Team of the DOC was accepting candidates. Plaintiff wanted to advance her career at the DOC and applied for a position within the Special Search Team.

91. In or around September 2020, as Plaintiff was exiting the elevator, she came across Defendant Lewis and an unknown officer. Both Defendant Lewis and the unknown officer were entering the elevator as the Plaintiff was exiting it.

92. As the doors of the elevator were closing, Plaintiff observed Defendant Lewis telling the other unknown officer, **"She is trying to get on the team, but I made sure it's never going to happen."**

93. Since this encounter with Defendant Lewis, several officers had asked Plaintiff if she interviewed with the Special Search Team because they had been conducting interviews and accepting candidates that upon information and belief, had less experience and time on the job than the Plaintiff.

94. Plaintiff was never even called for an interview. Upon information and belief, based on Defendant Lewis' remarks and behavior, in conjunction with Plaintiff's protected complaints, the DOC prevented Plaintiff from being on the Special Search team.

95. In or around September 2020, while stationed in the Mess Hall, Plaintiff met Officer Laurice Williams.

96. Upon finding out that Officer Williams was a member of the Special Search Team, Plaintiff told Officer Williams that she had applied for admittance to the unit, but was certain she would not be interviewed; nor accepted for the position. Eventually Plaintiff learned that Defendant Lewis was the head of the Special Search Team (Plaintiff would have applied elsewhere had she originally been privy to this fact).

97. About six (6) months later, on or about March 23, 2021, Captain Philips, a mutual acquaintance of Plaintiff and Officer Williams, contacted Plaintiff to ask for her permission to share her contact number with Officer Williams.

98. Within the day, Officer Williams contacted the Plaintiff stating that she had been subjected to constant sexual harassment by Defendant Lewis.

99. Officer Williams informed the Plaintiff that she was going to file an EEO Complaint against Defendant Lewis and inquired whether she could list the Plaintiff as a potential witness to Defendant Lewis' behavior, since Plaintiff was subjected to the same harassment.

100.    At first, Plaintiff was hesitant because she feared retaliation by Defendant Lewis and his colleagues. However, since Plaintiff and many other women were forced to interact daily with Defendant Lewis, Plaintiff agreed to be placed in Officer Williams' EEO Complaint.

101. On or about March 29, 2021, Officer Williams filed an official complaint against Defendant Lewis, naming Plaintiff as one of the witnesses and as a fellow complainant.

102. On or about April 7, 2021, an internal investigation began against Defendant Lewis based on the initial complaints from Officer Williams and the Plaintiff. It was at this time, that Plaintiff brought forth her time stamped memorialized complaint against Lewis and described the details of her own unlawful encounters with Defendant Lewis.

103. On or about June 4, 2021, Plaintiff had her first meeting with the EEO.

104. Immediately thereafter, Defendants retaliated against Plaintiff displaying a deficiency and/or deliberate indifference by failing to properly address Plaintiff's complaints.

105. In the weeks and months that followed, Defendants subjected the Plaintiff to a host of retaliatory and hostile acts.

106. Specifically, on or about June 13, 2021, upon volunteering for overtime, Plaintiff was given a meal relief post. However, this post was awarded to another officer while Plaintiff was sent to one of the most problematic areas of the facility at the time.

107. Defendants were aware of the dangers this area of the facility posed to female officers. Defendants could have sent any number of male officers and instead sent the Plaintiff, one of the only female Caucasian officers within the facility.

108. Within minutes of taking her post, Plaintiff was attacked by an inmate, followed shortly after by a second attack from behind by a second inmate.

109. Plaintiff sought immediate medical attention because she was injured during these attacks. However, Defendant Pinckney who was apprised of the situation, prioritized treating the inmates who had attacked Plaintiff, leaving Plaintiff in pain for four (4) hours before she could be seen by the medical staff.

110.   When she was finally seen in the medical clinic by specialist Rose Apollon, Plaintiff was deemed injured to the degree of warranting the dispatch of EMS to her location in order to carry her to the hospital.

111.   Soon thereafter, Defendant Mulgrav called Plaintiff on behalf of ADW Pinckney and ordered the Plaintiff to fill out a false report stating that she abandoned her post, which the Plaintiff did not do.

112.   Still in pain, Plaintiff advised Mulgrav "you told me to leave."  Plaintiff further explained that she was cleared by an officer to get medical attention as she had been injured.

113.   Captain Mulgrav and Defendant Pinckney disregarded Plaintiff's medical condition completely and ordered Plaintiff to fill out  the abandonment report; along with infraction reports, incident reports and a use of force report.

114.   To add insult to injury, Plaintiff heard from other officers that for two weeks ADW Pinckney was gossiping about the Plaintiff and tarnishing her reputation.

115.   Despite Defendants' knowledge that Plaintiff was placed in a dangerous situation, and despite other prior inmate assaults against the Plaintiff and others similarly situated, the DOC nonetheless mishandled the situation and placed the Plaintiff in harm's way.

116.   Upon information and belief DOC Supervisors retaliated against the Plaintiff for her EEO complaint, and purposely; or acting with deliberate indifference, placed the Plaintiff in harm's way.

117.   Upon information and belief, ADW Pinckney was aware of Plaintiff's EEO complaint.

118.   Furthermore, Defendant Pinckney ordered the Plaintiff to write all of the incident related reports by herself. Pinckney gave the order, even though she knew Plaintiff was administered pain medication at the hospital, and after being on the clock for twenty (20) plus hours. Plaintiff was threatened with more disciplinary action if she did not immediately fill out such reports.

119.   Although it was common practice for a Captain or separate officer to write the reports in the instance that the subject officer was injured, Defendants nevertheless ordered Plaintiff alone to fill out all reports.

120.   After being subjected to a litany of discriminatory, retaliatory and hostile acts, on or about July 14, 2021, the EEO Assistant Commissioner Elizabeth Lundi responded to Plaintiff's EEO complaint.

121.   The EEO advised Plaintiff that her  allegations revealed sufficient evidence to substantiate Plaintiff's claims of sexual harassment.

122.   Immediately after the decision by the EEO, retaliation and hostility against the Plaintiff increased drastically.

123.   In or around the beginning of September, 2021 DOC Defendants placed Defendant Lewis on modified service.

124.   On or about September 5, 2021, a "GoFundMe" page was set up for Defendant Lewis.

125.   Plaintiff was shocked to find out that 46 Officers had already contributed to the fund, showcasing that Defendant Lewis still had strong support among his peers, supervisors and subordinates.

126.   Upon information and belief, according to the DOC Rules and Regulations, it is unethical and unlawful for a DOC Captain to receive any form of remuneration *via* GoFundMe. Upon

information and belief, other DOC Captains received fines and/or penalties for participating in GoFundMe accounts.

127.    Upon information and belief, Defendant Lewis was never fined nor reprimanded.

128.    On or about October 25, 2021, Plaintiff's car was broken into and ransacked. Nothing was stolen. Plaintiff was shaken by the event and filed a police report.

129.    Upon information and belief, this incident may be connected to Plaintiff's complaints against Defendants and appeared to be a clear form of intimidation, amounting to more than just mere coincidence.

130.    Defendants' retaliatory and hostile actions against the Plaintiff were so apparent that it caught the attention of other officers. In or around November 2021, without Plaintiff's knowledge, but in good faith, Plaintiff's colleague, Correction Officer Olene Smith, informed Warden Floyd Phipps that the Plaintiff was being targeted by several supervisors.

131.    Plaintiff was not made aware of this until a later date, when in passing, Smith told Plaintiff that she had went to the Warden on behalf of Plaintiff because the harassment and hostility was so apparent that it could not be ignored.

132.    On or about November 2, 2021, Plaintiff arrived at her post and received a phone call on the work phone. The person on the line began asking questions and shouting orders. At the time, Plaintiff was not aware of who was on the other end of the call

133.    Standard protocol demanded that the Plaintiff ask the individual to identify themselves. Plaintiff asked who was on the call because on occasion inmates were known to have access to the phones. When Plaintiff inquired, the individual began yelling at the Plaintiff and berating her, while refusing to identify herself

134.    As a result of the above, the Plaintiff ended the phone call.

135.    Later, Defendant Figueroa spoke to the Plaintiff and demanded to know why Plaintiff

hung up the phone. Confused, Plaintiff asked what Figueroa was she was referring to.

136.    Defendant Figueroa then explained that she had called Plaintiff and Plaintiff hung up.

Defendant Figueroa then disciplined the Plaintiff.

137.    In order to not face any future disciplinary action, Plaintiff decided to make a notation

of the conversation with Defendant Figueroa in the logbook.

138.    This notation further irritated Defendant Figueroa.

139.    On or about November 8, 2021, in complete breach of protocol, Defendant Figueroa

retaliated against Plaintiff by ordering Plaintiff to be redeployed to another facility after

having completed her tour.

140.    Plaintiff informed Defendant Figueroa that she was serving outside her regular hours,

and that she was the only officer ordered to redeploy.

141.    Plaintiff further informed Figueroa that she had a "mutual" (shift swap with another

officer) which would be taking her shift the very next day.

142.    Ignoring Plaintiff's protestations, Defendant Figueroa retaliated against Plaintiff by

ordering Plaintiff to transfer to the other facility, blatantly breaching procedure, and

endangering Plaintiff's safety.

143.    Although numerous officers had refused to take the position and faced no

repercussions, Plaintiff was ordered to take the position while on overtime.

144.    Plaintiff approached Defendant Pinckney for help. Plaintiff informed Defendant

Pinckney that Defendant Figueroa was giving her orders out of retaliation that Defendant

Figueroa's order was in violation of protocol and that this order shouldn't be carried out.

145.   Upon review, Defendant Pinckney supported Defendant Figueroa's decision. Defendant Pinckney found Defendant Figueroa's order valid and instructed Plaintiff to comply.

146.   Not only did Defendant Figueroa breach protocol and retaliate against Plaintiff by redeploying her to a separate facility, she decided to turn it into a spectacle.

147.   Before Plaintiff left the facility, Defendant Figueroa continuously called Plaintiff over the radio. Defendant Figueroa knew fully that Plaintiff had already handed in her equipment and was not in the possession of a radio. However, Defendant Figueroa kept making these calls, just so she could make it known to everyone in the facility that Plaintiff was being redeployed. Defendant Figueroa even made transmissions over the radio that Plaintiff's "ride was outside waiting," making it appear as if Plaintiff was somehow not performing her duties

148.   Defendant Figueroa retaliated against Plaintiff by redeploying her to a new facility while Plaintiff was on overtime, completely breaching DOC policies on the matter.

149.   Additionally, Defendant Figueroa made sure that this event was being witnessed by the rest of Plaintiff's peers and thus willfully attempted to humiliate Plaintiff.

150.   Upon information and belief, Defendant Figueroa was aware of Plaintiff's EEO complaint against Defendant Lewis.

151.   More importantly, the DOC failed to take preventative measures to train captains and protect Plaintiff from experiencing a pervasive hostile work environment.

152.   On or about November 13, 2021, the Plaintiff spoke to the Union Delegate Quinones regarding the constant harassment and redeployment.  Plaintiff also spoke to Union Delegate McKoy, who immediately placed a call to Captain Figueroa and stated that

Figueroa should be well aware she was not supposed to send the Plaintiff to another facility on overtime. McKoy further told Figueroa that if the Plaintiff wanted to file a grievance letter, the Plaintiff would be well within her right to do so.

153.    Fearing further retaliation from Defendant Figueroa, Plaintiff decided not to place a grievance against her.

154.    On or about November 14, 2021, Plaintiff was the only officer in the Mess Hall taken off her post and ordered to work overtime by Defendant Jasmine.

155.    On this day, Defendant Jasmine tried to place the Plaintiff on a third day of overtime, but the Plaintiff had already worked for sixteen (16) hours.

156.    On or about November 21, 2021, Captain Wilson asked the Plaintiff about what, if anything, occurred between Plaintiff and ADW Pinckney. Wilson's comment baffled the Plaintiff, so Plaintiff asked for clarification. In response, Captain Wilson stated that the Plaintiff should "watch her back" because it was obvious that ADW Pinckney has a serious problem with the Plaintiff.

157.    On or about December 3, 2021, Plaintiff was the only officer in the Mess Hall ordered to do a meal relief by Defendant Jasmine. Upon information and belief, all the Mess Hall officers had to conduct a meal relief at some point, but Plaintiff was the only officer made to conduct multiple meal reliefs.

158.    Defendant Jasmine targeted Plaintiff by treating her disparately in comparison to her peers.

159.    Upon information and belief, male officers and/or non-Caucasian officers were not subjected to the same disparate treatment as the Plaintiff.

160.    Upon further information and belief, Defendant Jasmine was aware of Plaintiff's EEO complaints.

161.    On numerous occasions throughout December of 2021, Defendant Captain Hamilton reduced Plaintiff's shifts and redeployed her to other areas of the facility well into her day's work.

162.    For example, on or about December 8, 2021, Defendant Hamilton ordered Plaintiff to go to another area of the facility more than five (5) hours into her shift, ceding her position to Officer Burgess who is a male officer.

163.    The very next day, Plaintiff was once more ordered by phone to cede her post more than six (6) hours into her shift. When she asked who was issuing the order, Plaintiff was advised in a rude manner that it was Captain Davis.

164.    Knowing that Captain Davis would not talk to her in such a manner, Plaintiff inquired and found out that it had been Defendant Hamilton who in fact called and gave her the order to cede her post.

165.    Upon information and belief, Defendant Hamilton was also aware of Plaintiff's EEO complaint.

166.    On or about December 15, 2021, Plaintiff's shifts at Mess Hall were reduced, while Officers' Burgess, Burgoss, Petito, Wong, and Wright—all male officers—were not affected by the shift changes, clearly demonstrating the discriminatory nature of Plaintiff's shift reduction.

167.    On or about December 16, 2021, unbeknownst to Plaintiff, Officer Gayle informed Defendant Hamilton that Plaintiff was uncomfortable working with Hamilton because of the constant harassment.

168.    Officer Gayle told Plaintiff to stop worrying about Defendant Hamilton because Defendant Hamilton had assured Officer Gayle that she would leave Plaintiff alone.

169.    A few minutes later, while Officer Gayle was in the locker room with Plaintiff, she overheard Defendant Hamilton on the radio ordering Plaintiff to move from her regular post.

170.    On or about December 24, 2021, Christmas Eve, Plaintiff was the only officer ordered on post for 16 hours: conducting 15-minute tours, up and down the stairs, with no meal break. However, Defendants allowed all of Plaintiff's peers to go home and celebrate Christmas Eve with their families.

171.    Other officers worked four days a week, on twelve-hour shifts. However, Plainiff was ordered to work five days, on twelve-hour shifts. Plaintiff was the only officer subjected to such treatment. Furthermore Plaintiff was the only Caucasian female officer in the facility.

172.    In fact, Plaintiff was contacted from the control room by Officer Cuffy and asked about her overtime hours so that Cuffy could make proper notes for record keeping. Plaintiff informed Cuffy that she would hand them in once relieved from her position, but Cuffy insisted to put them down right away.

173.    In the phone call, Officer Cuffy asked the supervisor on post about how many hours of overtime she should allocate for the Plaintiff, to which the supervisor replied: "**She'll be alright, she's gonna stay a full tour.**"

174.    Plaintiff asked Officer Duffy which supervisor she was speaking to, since Plaintiff could hear the voice in the background. Cuffy informed Plaintiff that it was Defendant Hamilton who gave the order.

175.   On or about December 27, 2021, the Plaintiff advised her union delegate, Delegate Coley, that Defendants forced her to work sixteen (16) hours on Christmas Eve. However, unbeknownst to the Plaintiff, Coley told the Plaintiff that someone had already brought it to her attention.

176.   On or about January 7, 2022, Officer Boyd approached the Plaintiff to have a conversation.

177.   In fact, Officer Boyd shared a post with the Plaintiff on Christmas Eve.

178.   Officer Boyd pulled Plaintiff aside to tell her that when he was leaving his shift on Christmas Eve, he observed Captain Watson getting ready to relieve the Plaintiff from her shift. However, when Defendant Hamilton noticed, she intervened and ordered that Plaintiff be forced to stay for a sixteen (16) hour shift.  Office Boyd further advised the Plaintiff that he sensed anger in Defendant Hamilton's tone and observed a look of surprise on Captain Watson's face.

179.   On or about January 5, 2022, as a result of the continued harassment, retaliation and hostility, Plaintiff became physically ill and  went to the medical clinic. Medical personnel took Plaintiff's blood pressure and determined that it was way too high. This clearly exhibits the stress Plaintiff was under.

180.   Based on the above, Plaintiff once again complained to DOC Union Delegates Oyola and Quinones, describing the litany of retaliatory and hostile events, including the last event with Defendant Hamilton. Plaintiff explained that all of these actions took place after the Plaintiff had filed an EEO complaint against Defendant Lewis.

181.   The Union Delegates informed Plaintiff that they would send an email to ADW Rivera on her behalf regarding the (i) habitual removal of Plaintiff from her post in the Mess

Hall; and (ii) the constant redeployment of Plaintiff to other sites, while other officers were brought in to cover her post.

182.    On or about January 11, 2022, the Plaintiff spoke to Delegate Oyola again to see if anything was resolved. Delegate Oyola instead stated that the Plaintiff needed to stop being so nice and not be afraid to complain or stand up for herself.

183.    On or about January 13, 2022, Plaintiff contacted EEO and spoke to Melanie Barnes about scheduling a meeting in order to discuss the discriminatory, retaliatory and hostile work environment Plaintiff was facing as a result of prior complaints.

184.    Specifically, Plaintiff wrote the following:

"I am the only Mess Hall Officer that was awarded a Mess Hall post in writing being shift reduced on all three tours. Since my post has been shift reduced, another Mess Hall post which everyone knows is the exact same duties as my post was awarded to a new officer CO Reilly. CO Williams, CO Delaine, CO Burgos, CO Joissin, CO Welsh, CO V Williams, CO Petitos, CO Valdivia, CO Mercedes, CO Reves, CO Benjamin, CO Quammaie, CO Mangnum, CO Bryant, CO Stoute, CO Etkins all remain in the Mess Hall, for a total of 16 officers. I am the only white female. CO Reilly's newly awarded post is CIFW Dining A/Food Service 220A/221. CO Reilly will be working CO Joissins two pass days 1200 x 2031 hours and my two pass days 1400 x 2231 hours clearly making CO Reilly the extra officer.

I was awarded my post from a long list of applicants based on my seniority, attendance, and job performance throughout my career and now I am being put on some of the most undesirable posts in the building as punishment. Every day I am anxious coming to work. I am being ordered to write frivolous reports as an intimidation tool. It is becoming an increasingly hostile environment and making it difficult to perform my job duties as an officer. I am being blatantly discriminated against and feel these supervisors are trying to influence others to join in with the harassment. Captain Hamilton can often be seen fraternizing in the KK with CO Cuffy, CO Brooks, CO Mangum, CO Williams and CO Lowery who often work in the control room with these supervisors and are allowed to manipulate the schedule dependent on the officer's popularity status and even given authority to stick other officers for overtime. They are almost always exempt from working in housing areas.

It is extremely embarrassing that so many officers are aware of what has been going on. Officers often make comments to me that they wouldn't put up with it. But I know I would be disciplined for speaking up. Officer

Joissin and CO Gayle have often made radio transmissions in the past for me and advised me not to because every time my voice is heard on the radio, I am targeted. It is not fair that I am forced to work in these conditions. This constant abuse has caused me to stop volunteering for overtime when I was known for often volunteering before this. I even had a request approved to work overtime at another facility by ADW Rivera not only is it effecting my pocket, but it is also affecting my health and mental health, causing me unnecessary anxiety working in this hostile environment. It is embarrassing that other officers feel the need to speak up on my behalf and that the other Mess Hall officers are requesting for me to do their vacation reliefs because they know how hard I work and how much I am being targeted. My reputation is being tarnished and

**I am being branded a pushover for allowing the abuse to continue. Many officers suggest that I am being discriminated against because I am a white female, but they are not aware of my sexual harassment complaint against Captain LEWIS but are aware that I am being targeted**. Many officers including Union Delegates have recommended me filing an EEO complaint. This harassment began shortly after I participated in an EEO complaint of sexual harassment against Morris Lewis. I have no doubt this is all retaliatory behavior."

185.    Upon receipt of this complaint, EEO scheduled the Plaintiff for a meeting on January

18th, 2022, which was later rescheduled to January 20, 2022.

186.    Oddly, right before Plaintiff's scheduled EEO meeting, on or about January 19, 2022,

someone attempted break in at the Plaintiff's house.

187.    The perpetrator tried to gain entry through the front door and through several windows

at approximately 1730 hours and then proceeded to throw a rock through the window.

The police and neighbors speculated that it did not seem to be a regular attempted break

in. Once again, this second break-in appeared to be more than mere coincidence.

188.    On or about January 19, 2022, that same day, still in shock and clearly upset from the

recent break-in attempts, Plaintiff decided to place a call to the Correction Officers

Benevolent Association ("COBA").

189.    Plaintiff spoke to Mike Maiello, who was an Executive Board member at COBA, and informed him about all the recent events that had transpired ever since Defendant Lewis sexually harassed her.

190.    Plaintiff further informed Mike Maiello that she had an EEO appointment the very next day. Mr. Maiello asked Plaintiff to inform him of the outcome of her meeting with the EEO representatives.

191.    On or about January 20, 2022, Plaintiff met with EEO representatives, Melanie Barnes and Virginia Rodriguez.

192.    Both representatives told Plaintiff that based on Plaintiff's report, they agreed that Plaintiff was facing retaliation and hostility.

193.    Nonetheless, both Barnes and Rodriguez refused to further investigate the claim because according to Defendants, Plaintiff did not fall into any of their protected classes; even though Plaintiff was sexually harassed, complained of gender-based discrimination, and also faced associational discrimination by standing up for Officer Williams.

194.    Plaintiff began to cry in the meeting and became visibly upset because she was aggravated by Defendants' failure to take any preventative measures to protect her at work.

195.    Upon completion of the meeting with the EEO representatives, Plaintiff contacted Mike Maiello to raise additional concerns regarding her EEO meeting.

196.    Mike Maiello informed Plaintiff that he would bring up Plaintiff's concerns to Keisha Williams, VP of the Correction Officers Benevolent Association ("COBA"). He told Plaintiff that she should expect a call from Keisha Williams.

197.   During the following days, Plaintiff was in contact with Keisha Williams, attempting to schedule a meeting, but Plaintiff would soon realize that Keisha Williams, Charles Windgate, and Lionel Cumberbatch, all of whom were members of the Executive Board of COBA, worked closely in the past with Defendant Lewis at the Eric M. Taylor Center ("EMTC").

198.   Coming to this realization, Plaintiff felt unsafe in disclosing her grievances with Keisha Williams and thought it best to postpone a meeting with her indefinitely since it would be futile to further complain.

199.   On or about February 25, 2022, while working overtime, Plaintiff became violently ill. Her tour commander that day was Defendant Pinckney.

200.   Plaintiff went to the medical clinic at 2:30 A.M. and was seen by a doctor approximately an hour later.

201.   Upon examination of Plaintiff, the doctor recommended that she should be immediately taken to a hospital because Plaintiff's condition was deemed to be life-threatening.

202.   Not only was Plaintiff not sent to a hospital, Defendants left her the clinic untreated and vomiting into a bag for more than thee (3) hours, until 7:00 A.M.

203.   Upon information and belief, Defendants' failure to immediately sent Plaintiff to the hospital, was a breach of DOC custom, policy and rules.

204.   Rather than calling an ambulance for her, supervisors suggested that Plaintiff should be dropped off to her car and drive herself to the hospital.

205.   Unable to drive herself, an ambulance was called. As the ambulance arrived, the emergency care staff could not put an IV into Plaintiff because she was very dehydrated.

206.    Plaintiff was then taken to the hospital by the ambulance. Once Plaintiff was released

from the hospital, she immediately returned to the facility where Defendant Pinckney

refused to accept Plaintiff's time slip, despite the fact that Defendants were supposed to

fill out the time slip in accordance with DOC policy.

207.    Defendant Pinckney retaliated against Plaintiff by purposefully failing to help

Plaintiff when she was severely ill and by refusing to sign Plaintiff's time slip.

208.    On or about March 1, 2022, Plaintiff spoke to the DOC Union Vice President ("VP"),

Glenn Morgan, concerning her recent medical issues and how Defendant Pinckney had

willfully prolonged her medical treatment and denied Plaintiff her pay by refusing to sign

the time sheet.

209.    In response, Union VP, Glenn Morgan, advised Plaintiff file that the union would file

a grievance against Defendant Pinckney.

210.    Although Plaintiff did not yet feel well, on or about March 3, 2022, Captain Wilson

ordered Plaintiff to do overtime, even though Plaintiff informed the Captain that she did

not feel well.

211.    Plaintiff then asked Captain Wilson to excuse her from performing overtime.

212.    Captain Wilson replied that Defendant Pinckney did not want to hear it, and ordered

Plaintiff to stay and work overtime.

213.    Plaintiff told Captain Wilson that she had worked more than 100 hours of overtime

during the prior month, which was much more than any other similarly situated officer.

While overtime can be a good thing, in Plaintiff's case, Defendants used it as a weapon

against Plaintiff, to exacerbate the already hostile and retaliatory environment that

Plaintiff was forced to endure.

214.   Plaintiff further explained that she was not trying to defy her order to do overtime, but that she was in fact feeling unwell, and would have to decline.

215.   Captain Wilson asked Plaintiff if she was being treated unfairly, to which Plaintiff responded that she did in fact feel she was being treated unfairly. Plaintiff explained to Wilson that every time Plaintiff was ordered to perform overtime, Wilson would send Plaintiff to the most problematic areas of the facility.

216.   Captain Wilson replied to Plaintiff that if Plaintiff wanted a better position, she should call her early and Captain Wilson would do Plaintiff the "favor" of placing her in a good post. Plaintiff was perplexed by Captain Wilson's statement, as it only added to the anxiety and stress of the hostile environment.

217.   From in or around March of 2022 through May of 2022, Defendants continued their retaliatory campaign against the Plaintiff, by constantly removing her from her posts, placing Plaintiff in dangerous situations with dangerous suicidal inmates, and disciplining Plaintiff for matters outside of Plaintiff's control.

218.   During this time period, other officers told the Plaintiff that they observed and acknowledged that Plaintiff was being targeted by the Defendants.

219.   On or about June 22, 2022, Plaintiff filed another protected complaint with Warden Phipps and Deputy Warden Rivera regarding the hostile and retaliatory behavior. Plaintiff specifically noted that she was subjected to disparate treatment on account of her complaints.

220.   For example, Defendants constantly ordered the Plaintiff to go on "hospital runs" with inmates, even though there were many other officers without a steady post and who were

qualified to carry a fireman that could have been assigned this task. Instead, Plaintiff was singled out and constantly removed from her steady post.

221. Even though Plaintiff complained about being targeted, nothing was done and Defendants continued to remove the Plaintiff from her posts throughout the following months.

222. Plaintiff observed that Defendants always accommodated the male officers and awarded them Plaintiff's steady post. As a result, on or about November 15th, 2022, Plaintiff complained about this to Captain Clarke on a phone call. Rather than be receptive to Plaintiff's complaints of disparate treatment, Captain Clarke ordered Plaintiff to another housing area, while permitting a male officer (never assigned to the post) to work Plaintiff's steady post.

223. Nothing was done and Defendants continued to remove the Plaintiff from her post, forcing Plaintiff to file yet another complaint with DOC Wardens and Administrators.

224. Throughout December of 2022, Defendants continued to berate the Plaintiff, remove the Plaintiff from her post and force her to make hospital runs.

225. On one such occasion, on or about November 28th, 2022, Captain Hamilton forced the Plaintiff to accompany a problematic inmate who was also pregnant. Though it was common practice and protocol for pregnant inmates to be accompanied by a minimum of three officers for a hospital run because it is difficult to restrain them if necessary, Captain Hamilton nonetheless sent the Plaintiff to conduct such a run with only one other officer.

226. As a result, while on the hospital run, the problematic inmate assaulted Plaintiff and Plaintiff sustained several injuries. The inmate even spit in Plaintiff's face, forcing Plaintiff to be prescribed a course of HIV preventative medication.

227.    Captain Hamilton knew of the dangers posed by this particular inmate and knew of the protocols and procedures for taking such an inmate on a hospital run. Nevertheless, Captain Hamilton was deliberately indifferent towards the Plaintiff and recklessly put the Plaintiff in harm's way. Hamilton's order which led to the attack, was a direct and foreseeable cause of Plaintiff injuries

228.    Shockingly, on or about December 28th, 2022, Defendants sent Plaintiff on a hospital run with the same exact inmate who viciously assaulted Plaintiff the previous month. Defendants knew full well about the previous assault but nonetheless put Plaintiff in harm' way yet again. Even when Plaintiff protested and explained the dangers, Defendants ignored her.

229.    Both before and after the above incidents, Plaintiff had several discussions with union delegates. Specifically, Plaintiff had a number of interactions with union delegate Quinones.

230.    Quinones acknowledged Plaintiff's frustrations and on one such occasion outright told the Plaintiff, "I told the warden that they need to stop picking on the white girl." Plaintiff was further told that moving forward, according to the warden they would "give everyone a taste of working in the house area too."

231.    However, Plaintiff protested this idea because now other officers would know full well that it was Plaintiff's complaint that led to the changes. As a result, this would no doubt create even more hostility amongst officers. In fact, no other officer since 2020 had ever been removed from their post.

232.    Throughout January, the Defendants continued to remove Plaintiff from her awarded post.

233.    Plaintiff decided to once again address the above retaliatory acts with the DOC EEO. In part, it was objectively clear, that ever since Plaintiff complained about Defendant Lewis' behavior and further supported Officer Williams' claims; the DOC was unlawfully targeting the Plaintiff because of her protected activities.

234.    On or about February 7, 2023, Plaintiff met with EEO Investigator Melanie Barnes and EEO Attorney, Anastasia Chin.

235.    Plaintiff brought up the chronological timeline of never-ending retaliatory and hostile events that occurred after Plaintiff's protected complaints of sexual harassment regarding Defendant Lewis and inmate assaults. Rather than afford Plaintiff due process and rather than offer any attempts to resolve Plaintiff's issues; Attorney Chin slammed her hand on the table and exclaimed, "That's it Officer Cronin! You have nothing else to say." Attorney Chin then stormed out of the office.

236.    Attorney Chin's actions demonstrated the deliberate indifference of the EEO to assist the Plaintiff and/or demonstrate a pattern and practice of the EEO which resulted in further injury to the Plaintiff. Even more telling, is the fact that Ms. Chin is an Attorney, paid by the City of New York, trained in advocacy. Yet, she was supposed to be an objective and neutral party.

237.    The DOC's pattern and practice of failing to address deficiencies and deliberate indifference in their protocol and training continued when Defendants assigned Plaintiff to administer medication to inmates all by herself.

238.    The above failures were called out by DOC Pharmacist, Shaheda Khanam, who told the Plaintiff that it was "absurd" for Plaintiff to give out medication alone and that the standard practice should have been for other DOC officers to assist Plaintiff.

239. In fact, as a result of the above, Plaintiff found herself supervising the entire post, while administering medication and also simultaneously being forced to chase inmates down the hallway who would run away and try to enter different housing areas.

240. Though the above incident did not result in direct injury to Plaintiff, it is a clear-cut example of a pattern and practice of the DOC to leave their officers in harm's way, just as they did earlier when Plaintiff was assaulted multiple times by other inmates.

241. By mid-February of 2023, Defendants were consistently reducing the shifts of other officers that were similarly situated to the Plaintiff. As a result, Defendants forced the Plaintiff to do additional work with less resources, which in turn left the Plaintiff in a high-risk and hostile environment.

242. Recently, upon information and belief, the Defendants have been removing FMLA ("Family & Medical Leave Act") pay from Plaintiff's paychecks. Plaintiff has not applied for FMLA and has not taken FMLA leave. Yet, Defendants removed and continue to remove 8.5 hours from Plaintiffs pay every single week.

243. Plaintiff complained to the DOC timekeeper and DOC Human Resources regarding the reduced pay. To date, Defendants have done nothing to rectify the situation.

244. Plaintiff has developed anxiety ever since she placed an EEO complaint against Defendant Lewis and complained about multiple breaches of protocol.

245. Plaintiff's work environment became so hostile, that it hindered the Plaintiff's work duties.

246. In fact, out of the sixteen officers who work in the Mess Hall, Plaintiff was the only individual who was consistently removed from her post and sent to other areas within the

facility.   Tellingly, Plaintiff was and still is one of the only females and Caucasian employees subjected to such treatment.

247.   These transfer orders from Plaintiff's superiors are a clear indication of the unlawful environment looming over Plaintiff on a daily basis.

248.   The constant unlawful measures taken against Plaintiff are not only taking a toll on her finances as well as her physical and mental health.

249.   Plaintiff lives in constant fear of retaliation, especially now that Defendant Lewis has been reinstated too full active duty.

250.   Additionally, Plaintiff has sought mental health treatment on account of Defendants' unlawful behavior.

251.   As a further result of Defendants' conduct, Plaintiff was left in a state of despair and hopelessness.

252.   As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

253.   As a result of Defendants' discriminatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress.

254.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of compensation which such employment entails.

255.   Plaintiff also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

256.   Plaintiff further has great trouble sleeping at night on account of Defendants' discriminatory and retaliatory conduct.

257.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with

full knowledge of the law, Plaintiff demands punitive Damages against the individual

Defendants.

258.    The above are just some of the examples of unlawful and discriminatory conduct to

which Defendants subjected to Plaintiff.

259.    The above acts also collectively constitute unlawful employment practices, which

taken as a whole also constitute an ongoing violation

**AS AND FOR A FIRST CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VII**
**(Not Against Individual Defendants)**

260.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

261.    Title VII states in relevant part as follows:

a)  Employer practices:

It shall be an unlawful employment practice for an employer:

(1) To fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race,
color, religion, sex, or national origin;

262.    This claim is authorized and instituted pursuant to the provisions of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, for relief

based upon the unlawful employment practices of the above-named Defendants.

Plaintiff complains of Defendants' violation of Title VII's prohibition against

discrimination in employment based, in whole or in part, upon an employee's

sex/gender.

263.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C.

2000 e et seq., by discriminating against Plaintiff as set forth herein.

**AS A SECOND CAUSE OF ACTION FOR
DISCRIMINATION UNDER TITLE VII
RETALIATION
(Not Against Individual Defendant)**

264.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

265.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-3(a)

provides that it shall be unlawful employment practice for an employer: "(1) to…

discriminate against any of his employees… because she has opposed any practice made

an unlawful employment practice by this subchapter, or because she has made a charge,

testified, assisted or participated in any manner in an investigation, proceeding, or

hearing under this subchapter."

266.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C.

2000e seq. by discriminating against Plaintiff with respect to the terms, conditions or

privileges of employment because of her opposition to the unlawful employment

practices of Defendants.

**AS A THIRD CAUSE OF ACTION FOR
VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1983
(Against All Defendants)**

267.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated

herein.

268.    42 U.S.C. §1983 provides that:

"Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress."

269.    In committing the acts of discrimination and retaliation complained herein, the Defendants acted under color of law to deprive Plaintiff of her clearly established constitutionally protected rights under the Fourth and Fourteenth Amendment of the United States Constitution.

270.    Plaintiff in this action is a citizen of the United States and all of the individual Plaintiff after she complained of unconstitutional violations and took steps to further harm Plaintiff's constitutional rights.

271.    Defendants also knew or should have known that they were unlawfully discriminating against Plaintiff and failed to respond or redress such actions in any way.

272.    Upon information and belief, Defendants were personally involved in either ordering or failing to take preventative and remedial measures to guard against the unconstitutional discrimination and retaliation against Plaintiff. Defendants also knew, or in the exercise of due diligence, should have known, that the unconstitutional actions taken against Plaintiff were discriminatory in nature and retaliatory.

273.    The failure of the individual supervisory Defendants to supervise and/or discipline any of the aforementioned Defendants with respect to their unlawful actions amounted to gross negligence, deliberate indifference, or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

274.    Defendants further failed to afford Plaintiff proper due process at the EEO level by not properly addressing Plaintiff's multiple complaints.

## AS A FORUTH CAUSE OF ACTION
## (EQUAL PROTECTION – 42 U.S.C. §1983)

275.   Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

276.   Defendants were at all relevant times, were supervising employees in the DOC, with oversight responsibility for the training, instruction, and supervision of their employees and of the Plaintiff.

277.   Defendants failed to intervene to prevent the clearly unlawful and unconstitutional actions taken against Plaintiff.

278.   Defendants actively participated in the clearly discriminatory, retaliatory and unconstitutional actions taken against Plaintiff.

279.   Defendants actively condoned other officers to participate in the clearly discriminatory and retaliatory actions taken against Plaintiff.

280.   Defendants also knew or should have known that their conduct was unlawfully discriminating against Plaintiff and failed to respond or to address such actions in any way.

281.   Upon information and belief, Defendants were involved in either ordering or failing to take preventative and remedial measures to guard against the unconstitutional discrimination and retaliation against Plaintiff.

282.   Defendants knew, or in the exercise of due diligence, should have known, that the unconstitutional actions taken against Plaintiff was likely to occur.

283.   The failure of the individual supervisory Defendants to supervise and/or discipline any of the aforementioned Defendants, officers, DOC prosecutors or other Defendants with respect to their unlawful discrimination and retaliatory actions amounted to gross

negligence, deliberate indifference, or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

## AS A FIFTH CAUSE OF ACTION
### (EQUAL PROTECTION – 42 U.S.C. §1983)

284.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

285.    The aforementioned sexual harassment Plaintiff was forced to endure at the hands of Defendant Lewis amounts to gender discrimination.

286.    The ensuing acts of sexual harassment committed by Defendants were based on Plaintiff's gender.

## AS A SIXTH CAUSE OF ACTION
### (*Monell* Claim – 42 U.S.C. §1983)

287.    Defendants violated the above statute through multiple acts of unlawful gender and race discrimination, sexual harassment, and retaliation.

288.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

289.    All of the acts and omissions by the Defendants described above were carried out against the Plaintiff pursuant to overlapping *de facto* policies and practices of the City of New York and its agents, which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of Defendant The City of New York and Defendant Department of Correction.

290.    Defendant The City of New York and its agency, The Department of Corrections, by

their policy-making agents, servants and employees, authorized, sanctioned and/or

ratified the individual wrongful acts of Defendant Lewis and other Defendants and/or

failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

291.    The actions of Defendant Lewis and of other Defendants resulted from and were

taken pursuant to the *de facto* policies and/or well-settled and widespread customs and

practices of the DOC. The relevant policies, customs and practices of Defendants

permitted Defendants to take unlawful and unconstitutional actions against the Plaintiff,

as is described in great length and set forth above.

292.    The existence of the foregoing unlawful *de facto* unwritten policies and/or well-

settled and widespread customs and practices is known to be encouraged, and/or

condoned by supervisory and policy-making officers and the DOC.

293.    Notwithstanding knowledge of such an unlawful *de facto* unwritten policy, practice,

and/or custom, these supervisory and policy-making officers and the DOC, have not

taken steps to terminate this policy, practice, and/or custom, and do not properly train

captains with regard to the unlawful acts cited throughout Plaintiff's Complaint, and

instead sanction and ratify this policy, practice, and/or custom through their active

encouragement of, deliberate indifference to, and/or reckless disregard of the effect of

said policies, practices, and/or customs upon the constitutional rights of Plaintiff and

other persons similarly situated to Plaintiff.

294.    The aforementioned DOC policy, practice and/or custom of failing to supervise,

train, instruct, and discipline captains within the DOC is specifically exemplified and

evidenced by the misconduct detailed herein.

295.    Plaintiff's injuries were a direct and proximate result of Defendants' wrongful *de facto* policy and/or well-settled and widespread custom and practice, and of the knowing and repeated failure of Defendants to properly surprise and train employees with regard to unconstitutional conduct.

296.    Defendant DOC knew or should have known that the acts alleged herein would deprive Plaintiff of her rights in violation of the United States Constitution.

297.    Defendants knew or should have known that the actions unlawful actions taken against Plaintiff would occur since almost identical actions of Defendants were complained of in the past and nothing was done to remedy such unlawful behavior.

298.    Defendants is directly liable and responsible for the acts of the individual Defendants because it repeatedly and knowingly failed to properly supervise, train, and instruct them to require compliance with the constitutions and laws of the State of New York and the United States.

299.    Defendants acted with deliberate indifference by (i) continuing to place Plaintiff in dangerous situations with inmates resulting in assault and injury to the Plaintiff; (ii) having knowledge of Defendant Lewis' unlawful behavior from past complaints but nonetheless leaving Plaintiff to be sexually assaulted and harassed; and (iii) mishandling and/or failing to properly train employees who were tasked with assisting the Plaintiff and others similarly situated. The aforementioned constitute some of the many example by which Defendants deprived Plaintiff of her constitutional rights.

**AS A SEVENTH CAUSE OF ACTION FOR**
**VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1985**
**(Against All Defendants)**

300.    Plaintiff incorporates all preceding paragraphs of this Complaint as fully restated herein.

301.    Section 1985(3) provides, in relevant part, that:

"If two or more persons in any State or Territory conspire… for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws… in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property… the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

302.    All of the aforementioned Defendants acted either, directly or indirectly, in concert with one another, in unlawfully discriminating and retaliating against Plaintiff on the basis of gender.

303.    Similarly, all of the aforementioned Defendants acted, either directly or indirectly, o cover-up the unlawful discriminatory and retaliatory actions against Plaintiff.

## AS AN EIGHTH CAUSE OF ACTION FOR
## VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1986
## (Against All Defendants)

304.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

305.    Defendants failed to prevent a conspiracy amongst DOC employees to deprive Plaintiff of rights protected by the United States Constitution.

306.    Specifically, Defendants failed to prevent the execution of systematically discriminatory, retaliatory, hostile and unconstitutional actions against Plaintiff.

307.    As a result, Defendants violated the above statute.

**AS AN NINTH CAUSE OF ACTION FOR**
**DISCRIMINATION UNDER**
**STATE LAW**
**(Not Against Individual Defendants)**

308.    Executive Law § 296 provides that "1. It shall be an unlawful discriminatory

practice: (a) For an employer or licensing agency, because of an individual's age, race,

creed, color, national origin, sexual orientation, military status, sex, disability,

predisposing genetic characteristics, marital status, or domestic violence victim status,

to refuse to hire or employ or to bar or to discharge from employment such individual or

to discriminate against such individual in compensation or in terms, conditions or

privileges of employment."

309.    Defendants engaged in an unlawful discriminatory practice by discriminating

against Plaintiff as set forth herein.

310.    Plaintiff hereby makes a claim against Defendants under all of the applicable

paragraphs of Executive Law Section 296.

**AS A TENTH CAUSE OF ACTION FOR**
**DISCRIMINATION UNDER**
**STATE LAW**
**(Not Against Individual Defendants)**

311.    Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

312.    New York State Executive Law §296(7) provides that it shall be an unlawful

discriminatory practice:

"For any person engaged in any activity to which this section applies to retaliate or
discriminate against any person because [s]he has opposed any practices forbidden
under this article."

44

313.   Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff 's employer.

## AS AN ELEVENTH CAUSE OF ACTION FOR DISCRIMINATION UNDER STATE LAW (As Against Individual Defendants)

314.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

315.   New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice:

"For any person to aid, abet, incite, compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

316.   Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

## AS AN TWELTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE (Not Against Individual Defendants)

317.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

318.   The Administrative Code of the City of New York §8-107 [1] provides that it shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of

any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment. "

319.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff as set forth herein.

**AS A THIRTEENTH CAUSE OF ACTION FOR
DISCRIMINATION UNDER
THE NEW YORK CITY ADMINISTRATIVE CODE
(Not Against Individual Defendants)**

320.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

321.    The New York City Administrative Code Title 8, §8-107(1)€ provides that it shall be unlawful discriminatory practice: "For an employer… to discharge… or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter…"

322.    Each of Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1) by discriminating against Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

**AS A FOURTEENTH CAUSE OF ACTION FOR
DISCRIMINATION UNDER
THE NEW YORK CITY ADMINISTRATIVE CODE
(As Against Individual Defendants)**

323.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

324.   New York City Administrative Code Title §8-107(19) Interference with protected rights states that it shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

325.   Defendants violated the section cited herein as set forth.

<u>**AS A FIFTEENTH CAUSE OF ACTION FOR**</u>
<u>**DISCRIMINATION UNDER**</u>
<u>**THE NEW YORK CITY ADMINISTRATIVE CODE**</u>
<u>**(As Against Individual Defendants)**</u>

326.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

327.   The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

328.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful and retaliator conduct.

<u>**AS A SIXTEENTH CAUSE OF ACTION FOR**</u>
<u>**DISCRIMINATION UNDER**</u>
<u>**THE NEW YORK CITY ADMINISTRATIVE CODE**</u>
<u>**(Not Against Individual Defendants)**</u>

329.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the

above paragraphs of this Complaint as if more fully set forth herein at length.

330.    New York City Administrative Code Title 8-107(13) Employer liability for

discriminatory conducted by employee, agent or independent contractor states that:

a)  An employer shall be liable for an unlawful discriminatory practice based upon the

conduct of an employee or agent which is in violation of any provision of this

section other than subdivisions one and two of this section.

b)  An employer shall be liable for an unlawful discriminatory practice based upon the

conduct of an employee or agent which is in violation of subdivision one or two of

this section only where:

(1) The employee or agent exercised managerial or supervisor responsibility; or
(2) The employer knew of the employee's agent's discriminatory conduct, and
acquiesced in such conduct or failed to take immediate and appropriate
corrective action; an employer shall be deemed to have knowledge of an
employee's or agent's discriminatory conduct where that conduct was known
by another employee or agent who exercised managerial or supervisory
responsibility; or
(3) The employer should have been known of the employee's or agent's
discriminatory conduct and failed to exercise reasonable diligence to prevent
such discriminatory conduct.

331.    Defendants violated the section cited herein as set forth.

    **WHEREFORE**, Plaintiff demands the following relief jointly and severally against all

Defendants:

(a)  A declaration that Defendants violated Plaintiff's federal and state civil

rights;

(b)  Compensatory damages for the injuries suffered by Plaintiff b reason of

Defendants' unlawful and unjustified conduct, in an amount just and

reasonable and in conformity with the evidence at trial in an amount to

be determined at trial;

(c) Punitive damages against the individual Defendants assessed to deter

such intentional and reckless deviations from well-settled constitutional

standards to the extent allowable by law;

(d) Damages for emotional distress, lost wages, back pay, front pay,

statutory damages, medical expenses, interest;

(e) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988 and all

other applicable laws; and

(f) Such other and further relief as appears just and proper.

Dated: New York, New York,
      February 28, 2023

**L & D LAW P.C.**

<u>/s/ Paul Liggieri</u>
Paul Liggieri, Esq.
*Attorneys for Plaintiff*
11 Broadway, Ste. 615
New York, NY 10004
(212) 374-9786